UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY,<br>　　　Plaintiff,<br><br>vs.<br><br>GLOBAL NAPS, INC., GLOBAL NAPS NEW HAMPSHIRE, INC., GLOBAL NAPS NETWORKS, INC., GLOBAL NAPS REALTY, INC., AND FERROUS MINER HOLDINGS, INC.,<br>　　　Defendants,<br><br>and<br><br>CONVERGENT NETWORKS, INC., and FRANK T. GANGI,<br>　　　Reach and Apply Defendants. | Civil Action No. 08-12052-NMG |

**MEMORANDUM IN SUPPORT OF CONVERGENT NETWORKS, INC. AND FRANK T. GANGI'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND THEIR MOTION TO VACATE THE TEMPORARY RESTRAINING ORDER**

The reach and apply defendants, Convergent Networks, Inc. ("Convergent") and Frank T. Gangi, respectfully submit this memorandum in support of their opposition to the plaintiff's motion for a preliminary injunction and their motion for vacate the temporary restraining order. The plaintiff's motion is predicated upon the allegation that the defendants in this case have improperly transferred monies to Convergent and Mr. Gangi. As will be demonstrated below, the allegation is untrue.

**A.　THE LEGAL STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION**

The burden on a party seeking injunctive relief is a stiff one. It must prove (1) a "substantial likelihood of success on the merits" of its claim against the defendants, (2) a significant risk of substantial harm if the injunction is not granted, (3) a favorable balance of

hardships, and (4) a fit, or at least a lack of friction, between the injunction and the public interest. *Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166, 167 (1st Cir. 1998). Here, the plaintiff claims that it is entitled to have the court set aside alleged "fraudulent transfers" it claims were made by certain Global NAPs entities to both Convergent and Mr. Gangi. Those allegations are unsubstantiated and untrue. As will be shown below, Convergent has been paid fair value for services it rendered to the Global NAPs companies. Additionally, the plaintiff's allegation that Mr. Gangi receives a "high" salary, without disclosing what it is, is a red herring; he is entitled to the payments he receives from Convergent and the plaintiff has shown nothing to the contrary. Finally, the judgment in two cases in Connecticut and Massachusetts, of which the plaintiff makes so much, have nothing to do with Convergent; it was not a party to those cases and is not bound by any judgments entered therein.

**B.     AN INJUNCTION SHOULD NOT ENTER AGAINST CONVERGENT.**

As stated above, the plaintiff has the burden of showing a "substantial likelihood" that it will be able to prove that Global NAPs' assets were fraudulently transferred to Convergent. However, it has offered no proof of this; its claim is based on erroneous information and misplaced innuendo. Additionally, there is no risk of substantial harm if the motion is denied, and the balance of hardships favors Convergent.

> **1.     The plaintiff has not shown a substantial likelihood that it will prevail on its claim of fraudulent transfers.**
>
> The plaintiff's claim of fraudulent transfers is misplaced for the reasons set out below.
>
> > **a.     Convergent has been paid for services provided to Global NAPs Networks, Inc., and has not been used to "siphon" money from the Global NAPs companies.**

2

The plaintiff claims that Convergent was not entitled to the revenues it received from Global NAPs Networks, Inc. ("Networks") during the time in question. However, that claim is false. Convergent received the revenues in return for services rendered and did so for fair market value.

Convergent is in the business of servicing, maintaining, manufacturing and selling telecommunications switches. Its biggest customer is Networks. In addition to selling the switches, it also provided maintenance and repair services to Networks' switches for a fee up through part of 2006. Networks was not Convergent's only customer. Declaration of Frank T. Gangi. at ¶ 2 , attached as Exhibit A.

The plaintiff claims that the fee Convergent charged for these services was "substantial." However "substantial" the payment was, it was based on business economics. For example, it provided these services to another company[1] for $10,000.00 per month per switch. During the time in question, Networks owned approximately sixty switches. Therefore, based on the amount it charged one such customer, Convergent conceivably could have charged Networks approximately $600,000.00 per month for servicing those switches. However, it did not do so because it provided a reduction based on the volume of business it obtained from Networks. Instead, it charged approximately $500,000 per month, depending on the services the companies provided one another. Gangi Decl. at ¶ 3.

The plaintiff claims, without any support whatsoever, that the payment of these monies by Networks to Convergent was fraudulent. However, it never discloses the fact that there was a

---

[1] Due to confidentiality reasons, Convergent has not identified the name of this customer, but represents that it is not a company owned or controlled in any way by Mr. Gangi. Gangi Decl. at ¶ 3. The identity would, of course, be provided if Convergent were ordered to do so by the Court.

3

reason Convergent received this revenue. The twenty-five transfers it complains about between June 2004 and June 2005 (SNET br. at 5) were, in fact, those payments. At some point thereafter payments were made by Global NAPs New Hampshire, Inc. on behalf of Networks, again as compensation for Convergent's services.

SNET's complaint that the transfers were "substantial" is explained by the fact that they were made for the purpose of compensating Convergent for servicing and maintaining approximately sixty sophisticated telecommunication switches owned by Networks. Gangi Decl. at ¶ 4 . SNET does not define what it means by "substantial", but it should not be surprising that the care of a substantial number of complex switches involved payment of a substantial fee for those services. The plaintiff has offered no evidence whatsoever that the fee Convergent charged was improper in any way. Thus, its claim that the fee was too high should be ignored.

In light of the above, there is no "substantial likelihood" that the plaintiff will prove that the revenues received by Convergent for these services was fraudulent.

        **b.    There was no loan between Convergent and the Global NAPs companies.**

SNET's claim that there was a loan between Convergent and the Global NAPs companies is wrong. There was never any such loan. Gangi Decl. at ¶ 5. Rather, the accountants for Convergent apparently used a category on a spreadsheet entitled "loan" as a place holder for the payments due from Networks and did so until the end of the year when they trued-up the entry. Gangi Decl. at ¶ 5. SNET has not shown any evidence of any such loan other than notations made by third parties, nor has anyone testified that there was such a loan. Therefore, its claim is unsubstantiated and should not form the basis of grounds for an injunction.

    **c.**  **SNET's claim that Convergent engaged in wrongful conduct concealing the transfers is untrue.**

  SNET's claim that Convergent "attempted to conceal the transfers" is untrue. Gangi Decl. at ¶ 6. SNET bases its claim on the fact that it issued a subpoena to Convergent in the Connecticut case demanding access to its confidential business records even though Convergent was not a party to that case. Convergent objected to the subpoena, as would any other corporation. It is hardly unusual for a company to object to disclosing its confidential business records to other parties. The law permits it, and Convergent made the objection. Convergent was never found to be in violation of any court order relative to its objection. SNET provides no evidence whatsoever that Convergent has hidden or destroyed any documents relating to its finances, and should not be permitted to rely on such a claim without such support.

    **d.**  **SNET's complaint concerning Convergent's purchase of equipment from Networks and Global NAPs Realty, Inc. is unfounded.**

  SNET complains that Convergent purchased equipment from Networks and Global NAPs Realty, Inc. ("Realty"). However, the transaction of which it complains was performed for legitimate business purposes. Convergent purchased certain telecommunications equipment from Networks and certain telecommunications racks from Realty in return for their fair market value, $523,890.00. Gangi Decl. at ¶ 7. The background of the transaction is as follows.

  Sandy Stephens obtained a judgment against Global NAPs, Inc. ("Global") for wrongful termination of employment. The matter was then appealed. Ms. Stephens prevailed on the appeal, and the judgment then had to be paid. However, Global did not have sufficient funds to pay the judgment. Therefore, during subsequent negotiations the parties settled the case for a sum certain, which is confidential according to the terms of the agreement. As part of that settlement, Global arranged for the following transaction to assist it in paying the judgment and staying in business. Gangi Decl. at ¶ 8.

5

Convergent agreed to purchase equipment from Networks, including "Computers, Monitors, and Networking equipment of all types including but not limited to Sycamore, Convergent Networks and Cisco/Cerent" equipment, and telecommunications racks from Realty for $523,890.00. Convergent paid this money to John Barter, Esquire, Global's attorney, so he could in turn pay it to Ms. Stephens. Payment of that sum plus additional monies concluded her case. Gangi Decl. at ¶ 9.

As a result of the transaction, Global was able to remain in business. Global is essential to Networks' operations because it has the license to act as a competitive local exchange carrier under federal law; thus Networks needed Global to stay in business. Networks is essential to Convergent's business because Convergent's subsidiary, BroadVoice, Inc., depends on Networks to carry its telecommunications traffic; thus Convergent needed both Global and Networks to stay in business. In light of the above, it is clear that Convergent and Networks both had an interest in assisting Global to stay in business. Gangi Decl. at ¶ 10.

In any event, the equipment is still located where it had always been located. It continues to operate and keep the Global NAPs telecommunications network operating for the benefit of its customers. SNET has not been prejudiced because if, as it claims, the transaction was improper, the equipment is still accessible and will remain so. The equipment is essential to the integrity of the network. If it were removed, the network would cease to operate. Therefore, there is no reason for anyone to want to remove it. Gangi Decl. at ¶ 11.

**2. There is no significant risk of irreparable harm to SNET if the injunction is not entered against Convergent.**

The plaintiff has shown no "significant risk of irreparable harm" if its motion for an injunction is not granted. Convergent has operated, and continues to operate, in a legitimate business manner. No judgments or findings have been entered against it by any court. The

6

plaintiff did not even bother to add it as a defendant in its case, despite the fact that it apparently had all of the information it has appended to its motion.  There is no reason to believe that Convergent will not continue to operate in the manner it has always operated, which is to provide services to its customers in exchange for a fair fee.

>    **3.    The balance of hardships reveals that the injunction would be a greater detriment to Convergent than its absence would be to the plaintiff.**

An injunction enjoining Convergent from "alienating, conveying, transferring, assigning, hypothecating, depleting or otherwise disposing of or diminishing" its assets would pose a severe burden on it at any time, but even more so during these strenuous economic times.  The fact that the Order does "not preclude Convergent from taking such actions as are reasonable and necessary" to its continued business operations is of little solace.  If the Order remains in effect, Convergent will be subject to contempt findings in the event that it mistakenly takes an action the Court later deems inappropriate.  Operating a business in this climate with that kind of potential threat is tantamount to a stranglehold on the ability to make business decisions in an evolving industry.  Therefore, the hardship factor weighs in Convergent's favor, and the Court should deny the plaintiff's motion and vacate the temporary restraining order.

## C.    AN INJUNCTION SHOULD NOT ENTER AGAINST FRANK GANGI.

As with Convergent, the plaintiff has a substantial burden in showing that it is entitled to an injunction against Mr. Gangi.  It has not met this burden.  The sole claim in its complaint is that Mr. Gangi benefitted from a fraudulent transfer, yet it has presented no evidence of any such thing.

1. **The plaintiff has not shown a substantial likelihood that it will prevail on its claim of fraudulent transfers against Mr. Gangi.**

The only fraudulent transfers the plaintiff has apparently claimed with respect to Mr. Gangi is the fact that he obtains what SNET claims is a "high" salary and payment of his American Express bill by Convergent . Yet, it does not state what this salary is, or why it is "high." More importantly, it does not state that it is "too high," why it is too high, or why is it so high that it is, in fact, fraudulent. Nor is there any basis on which to conclude that the payment of his American Express bill was fraudulent. It is hardly unusual for compensation packages to include this kind of benefit.

A plaintiff may not obtain an injunction based on mere conjecture. And in Mr. Gangi's case it may not obtain an injunction by mere mud slinging, something SNET has attempted to do here with abandon. Instead, it has an obligation to set out in detail each and every relevant fact upon which it bases its allegation. Here it has not done so, and this Court should not be misled into concluding that there is a reasonable basis, let alone a "substantial basis," that its claims are justified. They are not.

2. **There is no significant risk of irreparable harm to SNET if the injunction is not entered against Mr. Gangi.**

The plaintiff has shown no reason to believe that there is any "significant risk of harm" if the injunction is not granted. Mr. Gangi continues to work for Convergent. The plaintiff has shown no evidence whatsoever that he has dissipated any of his own assets, or that they need to be protected in any way. A paucity of such evidence should not be rewarded with an injunction.

3. **The balance of hardships reveals that the injunction is a greater detriment to Mr. Gangi than its absence would be to the plaintiff.**

The Order provides that Mr. Gangi is enjoined from transferring his property and from spending more than $10,000.00 per month. However, he is not a party to the plaintiff's case in

8

Connecticut, and has not had any judgment entered against him in the plaintiff's favor. He should not be enjoined in the absence of any such involvement in the plaintiff's case. The Order presents a substantial hardship to him and should be vacated for that reason.

SNET's request that Mr. Gangi be limited to spending $10,000 per month is entirely arbitrary and will not permit him to continue to reside where he lives. Mr. Gangi resides in a home owned by a nominee trust, the beneficiaries of which are two minor children. In consideration for the right to live there he pays the real estate tax bills, utilities, and maintenance of the property. The total of those costs is approximately $18,000.00 per month. The real estate taxes he is obligated to pay are $120,000 per year, or $10,000 per month. The utilities and maintenance costs are approximately $2,200 per month for gas heat and $4,500 per month for electricity, due to the mechanical systems in place in the home (the electric system is heavily used to provide heat in the cold months and air conditioning in the warm months). Gangi Decl. at ¶ 15.

Mr. Gangi also has a child, not his own, who he cares for with the permission of the child's parents. He pays all of his expenses as well as his own, and estimates those expenses to be approximately $7,500 per month. Gangi Decl. at ¶ 16.

Therefore, at the very least, Mr. Gangi should be permitted to continue paying these costs, over and above the $10,000 per month limitation placed on him by the Court.

Mr. Gangi may also incur personal legal costs in the form of attorneys' fees and litigation expenses to defend a trial in this Court on January 5, 2009.[2] Gangi Decl. at ¶ 17. He should be permitted to pay all such costs over and above any limitations placed on him. Additionally, he should be permitted to pay all attorneys' fees and litigation costs related to this case and any other case in which he is named as a party over and above any such limitations placed on him.

---

[2] *Global NAPs, Inc. v. Verizon New England, Inc. v. Global NAPs Networks, Inc. et al*, no. 1:02-cv-12489-RWZ.

Finally, the portion of the Order enjoining Mr. Gangi from transferring stock runs counter to Massachusetts law.  G.L. c. 223 § 71 states, "Shares of stock shall not be attached in a civil action in which only money damages are sought."  Here, the plaintiff seeks monetary damages to satisfy a judgment.  Therefore, it may not attach or otherwise encumber Mr. Gangi's stock.

D.  **UNDER THE FACTS OF THIS CASE, AN INJUNCTION IS BEYOND THE SCOPE OF THE DISTRICT COURT'S POWERS AS ARTICULATED BY THE SUPREME COURT.**

A United States District Court does not have the power to issue a preliminary injunction preventing a defendant from transferring assets in which no lien or equitable interest is claimed. *Grupo Mexicano de Sarrollo, S.A. v. Alliance Bond Fund, Inc*., 527 U.S. 308 (1999).  Therefore, since the plaintiff does not have any lien or equitable interest in either Convergent or Mr. Gangi, its motion should be denied and the Order vacated.

E.  **THE ORDER IN THE CONNECTICUT CASE, OF WHICH SNET MAKES SO MUCH, WAS FLAWED, IS ON APPEAL, AND SHOULD NOT INFLUENCE THIS COURT.**

SNET repeatedly makes reference to the findings by the District Court in the Connecticut against other parties in that matter.  Although the findings in that case have no relevance here, in light of the manner in which the plaintiff has treated it in this motion it is worth providing some perspective on it.

First, it should be pointed out that **neither Convergent nor Mr. Gangi were parties to that case.**  The fact that a judgment was entered against other parties is not a reason for making any such finding against Convergent or Mr. Gangi.

Additionally, as pointed out in the defendant's memorandum in support of their motion for reconsideration, attached as Exhibit B, the findings in that case (hereinafter the "Judgment") were flawed for several reasons.  The Judgment rested upon factual errors, reliance on the

testimony of a biased witness who recanted her testimony, and adverse inferences concerning genuine issues of material fact that should have been resolved in favor of the defendants. In reaching the Judgment, the Court overlooked certain important facts and misapplied the law.

The Judgment was based in large part on the actions of defendants' bookkeeper, an independent contractor and non-party, and alleged misconduct by an individual (Richard Gangi) who has passed away and therefore could gain neither the benefit of misconduct nor suffer the pain imposed by the default. It was unduly harsh to default parties based on an independent contractor's actions. And certainly default judgment should not have entered where she acted *without* the defendants' knowledge; *without* the defendants' assistance; and *without* the defendants' authorization. Likewise, the Judgment rested upon the demonstrably incredible, inadmissible, and recanted testimony of Sheila Gangi, Richard Gangi's ex-wife, and inferences therefrom, which were shown to be unfounded. (Jdgt. at 23).

1. **There was No Destruction of a "General Ledger."**

The Judgment relied extensively upon the purported existence of an unproduced "general ledger" as evidence that the defendants willfully violated an Order requiring them to produce "balance sheets, cash statements, registers, journal, ledgers." (Jdgt. at 15.) The Court wrestled with testimony by Joan Conway, an outside accountant, and Richard Gangi that mentioned a general ledger, as well as printouts titled "general ledger" produced by an accountant. (*Id*.)

The defendants stated that there was no "general ledger" in the traditional sense. The bookkeeper used Peachtree accounting software to keep the records; Peachtree is a database tool. With Peachtree, one enters data concerning revenues and expenses into a general database ("money in and money out" in the words of Janet Lima). One can then generate a variety of reports, including a general ledger, or not. The option to create a general ledger report must be affirmatively chosen. A general ledger is not automatically created. And if it was created, it did

not actually have to be printed.  The defendants said they had no business need to continuously print their financial data, much less to print it in formats that it did not need or utilize, or even to keep it.  These are not public companies.  They are subchapter S corporations run by family and friends.  They perform their services, collect their fees, the shareholder pays the taxes, and they move on.  That is not uncommon.  The fact that the defendants' accountant had general ledger reports only for certain periods of time meant only that it received printouts for those times – there was no evidence that a comprehensive "general ledger" was ever printed or even portions printed on a regular basis.  There is simply no evidence that any "general ledger" was destroyed, willfully or otherwise.  Given those facts, the Court should not have found against them.

Additionally, entry of a default is not permitted when the documents sought cannot be produced.  A "party is not obliged to produce, at the risk of sanctions, documents that it does not possess or cannot obtain."  *Societe Internationale Pour Paticipations Indstrielles et Cammerciales, S.A. v. Rogers*, 357 U.S. 197, 212 (1958).

Finally, the fact that the Peachtree data was lost when Janet Lima dropped her computer did not justify a default judgment.  Production should have been made in a timely manner, but the fact that it was not did not justify the harsh sanction imposed. *See*, *e.g.*, *Sun v. Board of Trustees of University of Illinois*, 473 F.3d 799, 811-812 (7th Cir. 2007)(holding that delays in complying with discovery were not extreme enough to warrant default judgment).  There was no evidence that if production had been made earlier, the computer Mrs. Lima used would not have broken and therefore it was the delay that caused the data loss.

> **2.    There Was No Evidence That Defendants Erased Relevant Documents Willfully or In Bad Faith**

The Judgment also rested heavily on an assumption that Mrs. Lima deliberately destroyed relevant evidence on her computer, and that such destruction violated the Court's orders.

12

However, Mrs. Lima was not an employee or agent of any the defendants (or the reach and apply defendants). She runs her own company, Select & Pay, Inc. The defendants did not supervise her actions, let alone control her actions with respect to the computer.

Further, she stated unequivocally that she was told by the defendants not to delete any files, and did not inform any of the defendants before deleting files. The defendants did not know what she was doing, and she acted contrary to their instructions. The defendants should not have been defaulted for that.

It was the Court's belief that the materiality of the files was not important; rather "the intentional or grossly negligent destruction of evidence in bad faith can support an inference that the destroyed evidence was harmful to the destroying party." (*Id*.). In making that evaluation, the Court appears to have concluded that absolutely no files should have been deleted from Mrs. Lima's computer regardless of whether they were relevant to the action. The standard, however, is not that. It is whether there was destruction of "relevant" evidence; indeed, a party only has the duty to preserve "relevant" evidence. *Zubulake v. UBS Warburg, LLC.*, 220 F.R.D. 212, 216 (S.D.N.Y.). There was no evidence that Mrs. Lima intentionally or negligently destroyed files *relevant* to the Action.

### 3. There Was No Evidence That Frank Gangi Caused Items to be Removed from Richard Gangi's Home

The Court mistakenly concluded that Frank Gangi or his agents removed items from Richard Gangi's home. There was no evidence that anyone saw him do any such thing. In fact, the only evidence cited by the court was the testimony of Sheila Gangi, Richard Gangi's ex-wife, who said she saw Mrs. Lima take a computer from Richard's house. Ms. Gangi clearly had plenty of reasons to make up her story, and in fact later recanted some of her sworn testimony. Despite being an ex-spouse, she had wanted to be the administratrix of her ex-husband's estate,

an unusual request to say the least. Not surprisingly, Frank Gangi did not agree to this, and the two became embroiled in litigation in the probate court. In her effort to influence her ex-husband's estate and her ex-brother-in-law's attempt to be administrator, she had more than enough motives to lie in her testimony, and was eventually discredited and recanted portions of it.

At her deposition, Ms. Gangi admitted that she had no personal knowledge that Frank Gangi had taken the laptop. She subsequently reiterated that fact by affidavit. Previously, she stated that her sole basis for believing that Frank Gangi had the computer was that: "I just know that Frank has it because he sent me back an email from it." However, as Ms. Gangi surely knew, the fact that Frank Gangi forwarded one of Richard Gangi's emails did not in any way prove that he had Richard's computer. Email that resides on a server may be accessed remotely from any computer as long as someone has access to the server, and the user's password. As long as someone types in the proper email address and password, they can obtain and send emails from their email account. This is precisely what Frank Gangi did to send the email at issue to her.

Thus, Sheila Gangi twice recanted testimony upon which SNET, and the Court, relied. She was never subject to examination or cross-examination in that Action. None of the parties, nor their counsel, were present for her deposition – thus any and all testimony by Sheila Gangi was inadmissible. Her previous testimony was given in order to prevent Frank Gangi from being named administrator of Richard Gangi's estate and to have herself named administratrix. In light of all of the above, Sheila Gangi's testimony should have been entirely disregarded. In all events, her testimony should not have been the foundation for entry of a default judgment.

### 4. Items In the Custody of Richard Gangi's Estate Were Insignificant, but Were Produced

That the defendants did not more quickly retrieve documents from the Richard Gangi estate was not grounds for default either. They were not legally permitted to gain access to his

home without authority from the trustee. They did request documents from the trustee, receive documents from the estate, and produce them to both Verizon and SNET. They had had no business reason to seek them. So far as they knew, no items they needed for their business were missing or otherwise suspected of being in Richard Gangi's home.

In any event, as the defendants had suspected, the documents received from the trustee proved to be largely insignificant. Had SNET wanted to expedite the process of gaining access to that material, it could have subpoenaed the estate, or requested that the probate court order them released, especially given that SNET's counsel consistently attended the probate hearings.

**F.     CONCLUSION**

As has been shown above, there is no evidence that Convergent is the recipient of any fraudulently transferred property. Convergent was paid fair value for services it rendered to the Global NAPs companies. Nor is there any evidence that Frank Gangi received any fraudulently transferred property. The plaintiff's allegation that Mr. Gangi receives a "high" salary is meaningless without more; he is entitled to the payments he receives from Convergent and the plaintiff has shown nothing to the contrary. The harm of the proposed injunction is greater to both Convergent and Mr. Gangi that to the plaintiff. It would prevent Convergent from conducting its business as it needs, and would prevent Mr. Gangi from continuing to live in his residence. Finally, the plaintiff's use of the default judgment in the Connecticut case should be seen for what it is, a crude attempt to divert the Court's attention from the fact that it does not have enough evidence to support its request for an injunction.

WHEREFORE, Convergent Networks, Inc. and Frank T. Gangi request this Honorable Court to deny the plaintiff's motion for a preliminary injunction and vacate the temporary restraining order.

Respectfully submitted by,

/s/ William J. Rooney, Jr.

William J. Rooney, Jr
LAW OFFICE OF WILLIAM J. ROONEY, JR.
89 Access Road
Norwood, MA 02062
(617) 687-1405
(617) 507-4015 Fax
*Attorney for Convergent Networks, Inc. and Frank T. Gangi*

CERTIFICATE OF SERVICE

I, William J. Rooney, Jr., hereby certify that this document filed through the ECF system was sent electronically to the registered participants as identified on the notice of Electronic Filing (NEF) and paper copies were sent to those indicated as non registered participants on December 16, 2008.

/s/ William J. Rooney, Jr.
William J. Rooney, Jr
LAW OFFICE OF WILLIAM J. ROONEY, JR.
89 Access Road
Norwood, MA 02062
(617) 687-1405
(617) 507-4015 Fax